*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
KISOR, DALY, and MIZER
Appellate Military Judges

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jaden T. ROHLFS**
Lance Corporal (E-3), U.S. Marine Corps
*Appellant*

**No. 202300019**

————————————

Decided: 23 July 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Nicholas S. Henry

Sentence adjudged 28 September 2022 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1, confinement for 24 months, forfeiture of all pay and allowances, and a dishonorable discharge.

For Appellant:
*Major Joshua P. Keefe, Major, USMC (Argued)*
*Lieutenant Jackson M. Beach, JAGC, USN (On Brief)*

For Appellee:
*Lieutenant Lan T. Nguyen, JAGC, USN (Argued)*
*Lieutenant Commander James P. Wu Zhu, JAGC, USN (On Brief)*

Senior Judge DALY delivered the opinion of the Court, in which Senior Judge KISOR and Judge MIZER joined.

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

————————————

DALY, Senior Judge:

Appellant was charged with one specification of negligent homicide, in violation of Article 134, Uniform Code of Military Justice (UCMJ), one specification of involuntary manslaughter, in violation of Article 119, UCMJ, and one specification of obstruction of justice, in violation of Article 131b, UCMJ.[1] Appellant pleaded guilty to negligent homicide and not guilty to involuntary manslaughter and obstruction of justice. A military judge, sitting alone, convicted Appellant of negligent homicide and involuntary manslaughter and found him not guilty of obstruction of justice. After findings were entered, the military judge conditionally dismissed Appellant's negligent homicide conviction and sentenced him for involuntary manslaughter.

Appellant asserts one assignment of error (AOE): whether the evidence is legally and factually sufficient to support his conviction of involuntary manslaughter. We find no prejudicial error and affirm.

## I. BACKGROUND

### 1. Live Fire Training and Follow-On Inspections

Appellant conducted live fire training with his platoon on Range 111 in Twentynine Palms, California on 2 October 2022. The range control officer gave a safety brief to the Marines before ammunition was distributed and the exercise began. The safety brief included the four weapons safe handling

---

[1] 10 U.S.C. §§ 934, 919, 931b.

rules.[2] Appellant attended this safety brief with his platoon. As a Marine, Appellant had been repeatedly instructed on the four weapons safe handling rules beginning in boot camp. And as a Marine rifleman[3] serving with the infantry, Appellant handled firearms routinely.

At the conclusion of the live fire training on Range 111, Appellant and his platoon underwent an inspection with the Marshalling Area Control Officers (MACO). The MACO inspection consisted of two Marines who checked each platoon member's rifle, chamber, magazines, gear, and person for any live ammunition. This inspection specifically included pulling and locking each rifle's bolt back to the rear and examining inside the chamber to ensure no rounds remained in the weapon or in the possession of the Marine being inspected.

Afterwards, Appellant and his platoon went through a *second* inspection performed by their squad leaders. For the second inspection the squad leader visually inspected each Marine's rifle and gear for ammunition. Appellant's squad leader, Corporal (Cpl) Beta,[4] testified he inspected Appellant's rifle, the magazines, pouches, and any gear in the vicinity. Corporal Beta further stated Appellant's rifle was in condition four.[5]

After the squad inspection, Appellant traveled with his platoon to Range 230. They arrived in the evening and bivouacked outside Range 230. The next day, 3 October 2022, the agenda was to plan, rehearse, and conduct reconnaissance for the upcoming live fire exercise attacking a mock town on Range 230 the following day. No ammunition was distributed to the platoon or to Appellant. No live fire was scheduled for this day. As such, no additional safety brief was given.

The platoon and Appellant started their day with a tape-house exercise. The tape-house simulated the building's walls and doors with engineer tape on the ground that formed an outline of the buildings.[6] The Marines practiced

---

[2] (1) Treat every weapon as if it was loaded; (2) Never point your weapon at anything you do not intend to shoot; (3) Keep your finger straight and off the trigger until you intend to fire; and (4) Keep your weapon on safe until you intend to fire. R. at 269, 296, and 309.

[3] (Appellant's Military Occupational Specialty is 0311, Rifleman) Pros Ex. 11 at 2.

[4] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[5] Safety on, magazine removed, chamber empty, bolt forward, and ejection port cover closed. R. at 142 and 282.

[6] R. at 140, 204-220, 251, and 304.

clearing (the removal of enemy forces) from the simulated tape-house buildings. Captain (Capt) Sierra, the range Officer-in-Charge, explained that tape-house exercises could be conducted anywhere, even when not on a range. During these exercises Marines may often flag[7] each other; so prior to any tape-house exercise all Marines conducting that training would normally be cleared[8] out at a minimum by their squad leader. Marines would not take their weapons off safe or pull the trigger. However, there was no testimony that Appellant or his squad were inspected for ammunition or verified for condition four weapons before the tape-house exercise.

After the tape-house exercise, the platoon ate and began weapons maintenance. Several Marines testified that the entire platoon conducted weapons maintenance in the same location. However, no one specifically testified that Appellant was seen there cleaning his weapon.

That afternoon, another Marine unit, not Appellant's, completed its live fire training on Range 230. Once those Marines were inspected for live ammunition and shell casings (brass), they departed Range 230. The range itself was not cleared of ammunition or shell casings between live fire exercises. Specifically, Capt Sierra, authorized the previous company to depart the range without conducting a police call,[9] where the Marines cleaned the range to return any shell casings or live rounds back to him for accountability. This decision was made to save time, as a police call could take two to four hours, "[a]nd that's the time we did not have to waste before the sun came down for the next company to do their dry run."[10] Corporal Alpha testified that there were live rounds on Range 230, explaining "[t]here was just various rounds [on the range]. So pretty much everything from 5.56 to 50 cal. that had just been discarded. Whether it was empty casing or live round. . . . there was a lot of rounds in the training area."[11]

---

[7] Pointing or sweeping a weapon at someone.

[8] Marine performs unload, locks bolt to the rear, allows for secondary inspection to ensure there are no live rounds or shell casings in the chamber, releases and watches the bolt go forward on an empty chamber. R. at 250, 259, and 300.

[9] When every Marine traces their footsteps from where they finished to where they started in order to pick up any brass fired from their weapons. If they happen to find live ammunition on the ground, they would pick that up as well. R. at 199.

[10] R. at 204.

[11] R. at 143.

*2. The Range Walk Through and Shooting*

After the other unit completed its live fire events, Capt Sierra authorized Appellant and his platoon to enter Range 230 for familiarization. The platoon was given access to the range so that they could "walk through the range, see the layout...The only thing they were allowed to take with them due to only being a walk through was their weapon, which is on their body at all times anyways. And then a water source as well."[12] Appellant's squad was responsible for clearing building 18. The platoon commander directed Appellant's squad, to "go ahead and go into the building and take a look around."[13] Specifically, this was not a dry run where Marines follow the plan as if it were really happening, moving tactically.[14] However, the Marines were not explicitly ordered to refrain from tactically entering the building.[15] Corporal Romeo testified the Marines treated the training seriously and had their weapons at the ready, not slung over a shoulder in an administrative carry.[16] Appellant carried his weapon tactically and was not corrected by his fire team leader.[17]

Appellant's squad entered the first room of the building in the following order: Lance Corporal (LCpl) Bravo (deceased Marine), Appellant, Cpl Alpha, Cpl Charlie, Cpl Tango (LCpl Bravo's and Appellant's fire team leader), Cpl Echo, LCpl Papa, Cpl Romeo, and lastly Cpl Beta. Lance Corporal Bravo and Appellant moved into the second room on the left. Lance Corporal Bravo entered the third room and returned to the doorway of the second room. Lance Corporal Bravo and Appellant were approximately 8 feet apart. Corporal Alpha testified he saw Appellant smile and raise his rifle. "[Appellant] wasn't expecting there would to be a live round and he discharged the weapon."[18] Corporal Tango testified that after entering the first room through the window, he practiced the movements of clearing the second room with his rifle slung when

---

[12] R. at 197.

[13] R. at 129.

[14] A dry run simulates combat movements of entering a house with weapons carried at the ready. R. at 129.

[15] R. at 134.

[16] R. at 244.

[17] R. at 264.

[18] R. at 143.

he faced Appellant. According to Cpl Tango, when the shot went off, Appellant had the weapon "raised" and on his "shoulder aimed towards [LCpl Bravo]."[19]

Immediately following the shooting, Appellant dropped his rifle, screamed, ran out, and called for a Corpsman. Corporal Echo helped Appellant call for a Corpsman. Corporal Echo testified that Appellant then sat down in the corner of the first room of building 18 and started crying. Corporal Echo hugged and comforted Appellant and wanted to make sure he was okay. He testified that Appellant said, "[t]hat it wasn't supposed to happen."[20] Corporal Echo also testified that after he let go of him, Appellant pulled another round out of his pocket and shoved it into the ground. Corporal Echo described it as a "casing . . . shiny brass."[21] Corporal Echo did not know the caliber, or if it was a live round or merely a shell casing. He also testified that as Appellant shoved the round into the ground, Appellant said "f**k this s**t."[22]

### 3. Appellant Pleaded Guilty to Negligent Homicide

Appellant pleaded guilty to negligent homicide without a plea agreement. The military judge went over the defense of accident with him. After the military judge found Appellant's guilty plea provident and accepted it, the Government moved forward on the charges to which Appellant pleaded not guilty (involuntary manslaughter and obstruction of justice).

### 4. Appellant Entered a Stipulation of Fact and Evidence

During the contested part of the case, Appellant entered a stipulation of fact and stipulated to evidence[23] that his weapon, fully functional, discharged the 5.56 round that struck LCpl Bravo in the chest. He was airlifted to Naval Hospital Twentynine Palms in an unsuccessful attempt to save his life.

Appellant also stipulated that NCIS agents collected a "live 5.56 CAL round" from Building 18 at Range 230. The live round was found on the ground in a corner adjacent to the entrance to Building 18. Appellant also stipulated the round (Prosecution Exhibit 14 – Live Round) was authentic and the proper

---

[19] R. at 255.

[20] R. at 224.

[21] *Id.*

[22] R. at 225.

[23] Pros. Ex. 18. The Stipulation of Fact was not used during Appellant's guilty plea and was introduced as evidence during the contested portion of his case.

chain of custody was maintained. Appellant did not object to entering as evidence photographs of the same in Prosecution Exhibit 5.[24]

Additional facts necessary to resolve Appellant's AOE are discussed below.

## II. DISCUSSION

**A. The evidence is legally and factually sufficient.**

*1. Standards of review:*

a. Legal sufficiency:

To determine legal sufficiency, a question we review de novo, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[25] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[26] "As such, the standard for legal sufficiency involves a very low threshold to sustain a conviction."[27]

b. Factual Sufficiency:

Our authority to review cases for factual sufficiency is found in Article 66, UCMJ. Historically, our duty to review for factual sufficiency was to conduct a de novo review of the case.[28] That changed for offenses committed after 1 January 2021, when Congress amended Article 66. As we have previously stated, to trigger factual sufficiency review under the present Article 66(d)(1)(B), UCMJ, two circumstances must be present: "(1) a request of the

---

[24] Pros. Ex. 5, 4 - 5.

[25] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014).

[26] *United States v. Nicola*, 78 M.J. 223, 226 (C.A.A.F. 2019) (quoting *United States v. McGinty*, 38 M.J. 131, 132 (C.M.A. 1993) (internal quotation and citation omitted)).

[27] *United States v. Smith*, 83 M.J. 350, 359 (C.A.A.F. 2023) (internal citations and quotations omitted, cleaned up).

[28] *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

accused; and (2) a specific showing of a deficiency in proof."[29] In conducting our review, we are to give "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence."[30] We may not "dismiss, set aside, or modify [a] finding, or affirm a lesser finding" unless we are "clearly convinced that the finding of guilty was against the weight of the evidence."[31]

*2. The Charge in this Case:*

The involuntary manslaughter offense was charged as follows:

> In that Lance Corporal Jaden T. Rohlfs, U.S. Marine Corps, did, while on active duty, at or near Marine Corps Air Ground Combat Center Twentynine Palms, CA on or about 3 October 2021, by culpable negligence, unlawfully kill Lance Corporal [Bravo], U.S. Marine Corps, by shooting him with a service rifle.[32]

Thus, in order to prove involuntary manslaughter, the Government had to prove that, on or about 3 October 2021:

1) Lance Corporal [Bravo] is dead;

2) That the death resulted from the act or omission of Appellant;

3) That the killing was unlawful; and

4) That this act or omission of Appellant constituted culpable negligence.

The President defined "culpable negligence" as "a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission."[33] Importantly, conduct is culpably negligent when, "viewed in the light of human experience, [the conduct] might foreseeably result in the death of another, even though death would not necessarily be a natural and probable consequence."[34] As an example, the President identified several acts that could amount to culpable negligence, including "pointing a pistol in jest at another

---

[29] *United States v. Harvey*, 83 M.J. 685, 691 (N-M Ct. Crim. App. 2023), *rev. granted,* _ M.J. __ , No. 23-0239/NA, 2024 CAAF LEXIS 13 (C.A.A.F. Jan. 14, 2024)

[30] Article 66(d)(1)(B)(ii).

[31] Article 66(d)(1)(B)(iii).

[32] Charge Sheet.

[33] *Manual for Courts-Martial, United States* (2019 ed.) [MCM], pt. IV, para. 57.c.(2)(a)(i) at IV-79.

[34] *Id.*

and pulling the trigger, believing, but without taking reasonable precautions to ascertain, that it would not be dangerous."[35]

Similar to his strategy at trial, Appellant here only contests the fourth element, arguing that the Government failed to prove that he acted with culpable negligence.

### 3. The conviction is legally sufficient.

Appellant asserts that his conviction for involuntary manslaughter is legally insufficient because the Government failed to prove that Appellant was culpably negligent. A necessary element of culpable negligence is foreseeability. "The test for foreseeability is 'whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts.'"[36]

Appellant argues that his conduct did not constitute culpable negligence since it was not foreseeable his rifle had a round in the chamber because of the previous day's rifle inspections and that Appellant's reliance on the previous inspections amounted to reasonable measures. We disagree. A reasonable person, in view of all the circumstances, would recognize the substantial and unjustifiable danger in raising a weapon to one's shoulder, pointing it at another human being, and pulling the trigger. Even if we assume that the fatal round remained in Appellant's rifle from the live fire exercise on 2 October 2024, it was Appellant's responsibility to ensure the proper safe condition of his weapon before pointing it at another and pulling the trigger. Said another way, the other Marine's failure to catch Appellant's error does not absolve him of criminal liability. This is especially so given the length of time between the inspections and the shooting, the presence of ammunition, and the nature and circumstances in which he handled and employed his weapon.

Relying on *United States v. White,* Appellant argues that, "[m]ere lack of foresight, stupidity, irresponsibility, thoughtlessness, or ordinary carelessness, however serious the consequences may happen to be, do not constitute 'culpable negligence.'"[37] However, as we stated in *United States v. Watlington,*

---

[35] *Id.*

[36] *United States v. Oxedine,* 55 M.J. 323, 325 (C.A.A.F 2001) (quoting *United States v. Brown,* 22 M.J. 448, 450 (CMA 1986)).

[37] App. Brief at 27 citing *United States v. White,* 7 C.M.R 448, 451 (U.S.N.B.R. 1953).

"this language from a 1953 case does not reflect the current state of the law."[38] In culpable negligence cases, it is not "necessary that appellant foresaw a fatal outcome[;]" the law only requires that "a reasonable person, in view of all the circumstances" would have recognized the substantial and unjustifiable danger.[39] Accordingly, applying this objective standard, Appellant's subsequent "disbelief"[40] that his rifle discharged is irrelevant to the issue of whether he was culpably negligent.

Additionally, Appellant claims that the evidence of his failure to follow the four weapons safe handling rules cannot be per se culpable negligence. But the trier of fact was not required to find that Appellant's failure to follow the four weapons safe handing rules was per se culpable negligence and neither are we.[41] A reasonable trier of fact could find that Appellant should have inspected his weapon the next day and not relied on the previous day's inspections. Moreover, this, *combined* with his failure to follow the four weapon safe handling rules, aiming his rifle at LCpl Bravo, removing the safety, and pulling the trigger, could constitute a culpable disregard for the foreseeable consequences to others.

We are convinced that a reasonable factfinder could have found – as the military judge did – all the essential elements of involuntary manslaughter, including culpable negligence, beyond a reasonable doubt. Thus, viewing this evidence in the light most favorable to the prosecution, the conviction is legally sufficient.

*4. The conviction is factually sufficient.*

We find that while Appellant has made a showing sufficient to trigger our factual sufficiency analysis, he has not met his burden to show that his conviction is factually insufficient. After a complete review of the evidence and after giving appropriate deference to the fact that the military judge saw and heard

---

[38] *Watlington,* 2023 CCA LEXIS 426, at \*9 (N-M. Ct. Crim. App. 2023) *review denied*, __ M.J. __, No. 24-0074/NA, 2024 CAAF LEXIS 130 (C.A.A.F. Mar. 5, 2024).

[39] *Id.* at \*12 (citing *Oxendine,* 55 M.J. at 325).

[40] R. at 255.

[41] If this was a members case, there would be no per se culpability instruction, Dep't of the Army Pam. 27-9, *Military Judges' Benchbook*, para. 3a-43-2 (Apr. 12, 2024).

the witnesses, we are not clearly convinced that the verdict is against the weight of the evidence.[42]

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, and the excellent oral arguments of both counsel heard at the Washington Navy Yard on 14 May 2024, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[43]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[42] Art 66(d)(1)(B), UCMJ.

[43] Articles 59 & 66, UCMJ.